**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                            **Case No: 2:19-cr-172-FtM-38MRM**

**STEVEN THOMAS BARYLA**
_____/

## MOTION FOR ESSENTIAL MEDICAL TESTING

Steven Thomas Baryla, by and through his undersigned attorney, moves this Honorable Court for an order requiring the U.S. Marshal or its designee to test the Defendant for COVID-19 (commonly known as the Coronavirus).  As grounds in support thereof, Mr. Steven Thomas Baryla would state the following:

## FACTUAL BACKGROUND

1. On May 20, 2020, Jesus Casas, Assistant United States Attorney, advised the Federal Defender's Office that the Government takes no position on relief sought in this motion.

2. Around 4:00 am on May 11, 2020, over two dozen federal inmates at the Charlotte County Jail ("Charlotte") were shackled and put into three vans to be transferred to the Glades County Detention Center.

3. This trip, however, was cancelled because a Charlotte staff member who had worked with these federal inmates had tested positive for COVID-19. According to the U.S. Marshal, this staff member had contact with no less than 71 federal inmates housed at Charlotte.

1

4.  The federal inmates had never previously been advised of the positive COVID-19 test by the Charlotte staff member.  To date, the federal inmates have not been tested for COVID-19 despite their exposure to the sick staff member.

5.  While the U.S. Marshal's office made its decision to cancel the trip to the Glades County Detention Center, the inmates all waited in vans that were not running. By all accounts, the 15 to 20 minute wait in these vans was stiflingly hot, and the inmates, all thrust together in exceptionally close confines with one another, were not given any personal protective equipment ("PPE").

6.  After the long wait, the inmates were all escorted into a small holding cell before being returned to their prior cells.

7.  Though some of these inmates had their temperatures checked for about two days after, they have not since continuously been monitored despite reports of illness throughout Charlotte.

8.  Though Charlotte officials have attempted to assure the public and the Federal Defender Office that they have implemented proper procedures to combat the rampant spread of COVID-19, these assurances have been undermined with reports from inmates. While staff members at Charlotte have been "encouraged" to use PPE, Charlotte has not made this mandatory and most staff members, including those who are personally interacting with inmates, typically do not wear masks or gloves.

9.  There have also been several additional reports of illness both among staff and inmates, all of whom interact routinely within six feet of each other.  At least one report indicates that staff members, including those who bring inmates food

in their cells during mealtime, have been coughing and showing other symptoms of COVID-19.  At least one staff member was sent home after exhibiting signs of COVID-19, but not until after interacting with inmates for almost his entire shift.

10. Finally, as of May 18, 2020, an inmate (a separate client of the FDO) has experienced dizziness, chest pains, body aches, and a fever.  All he has received is Tylenol, and as of May 18, 2020, he has not been tested for COVID-19.  In addition, several other inmates report being sick with symptoms ranging from coughing to headaches.

11. While Mr. Baryla is not in the same POD as the inmates who were directly exposed to the infected officer, he has ample reason to be concerned. There is no social distancing between inmates and staff rarely wears masks. It is reasonable to believe that the Corrections Officers in his pod have had regular contact either with the infected staff member, as well as inmates and staff who have been exposed to the infected staff member. Since there does not appear to be any testing, there is no way to know how many staff or inmates that have contact with Mr. Baryla have actually been exposed.

12. Charlotte has stated that there is inadequate funding to have their inmates tested because the Florida Department of Health has deemed such testing non-essential.

13. Mr. Steven Thomas Baryla consents to be tested for COVID-19.

**MEMORANDUM OF LAW**

I.     **THE COVID-19 PANDEMIC HAS CAUSED A WORLD WIDE HEALTH EMERGENCY.**

On March 10, 2020, Governor DeSantis declared a state of emergency over COVID-19 in the State of Florida. On March 11, 2020, the World Health Organization designated the outbreak of COVID-19 a pandemic. On March 13, 2020, President Trump declared a national health emergency based on the risk of the global pandemic. On February 15, 2020, the United States had 15 coronavirus cases. *See Wordometers.info* (World/Countries/United States), (last updated: May 19, 2020, 13:00 GMT, last visited May 19, 2020). As of May 18, 2020, the United States had 1,550,294 cases. *See id.* On February 29, 2020, the United States had its first death. *See id.* As of May 19, 2020, the United States had suffered 91,981 deaths of its citizens. *See id.* The State of Florida has not been spared from the wrath of COVID-19. As of May 18, 2019, the State of Florida had 46,442 confirmed cases and 1,997 deaths. *See id.*

The virus typically presents itself through fever, cough, shortness of breath, and chills. CDC, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html, (last visited May 19, 2020). However, many people with COVID-19 are <u>asymptomatic</u>. CDC, Recommendations Regarding the Use of Cloth Face Coverings, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html#studies (last visited May 19, 2020). As a result, it is impossible to determine who has COVID-19 without <u>testing</u>. See *id.*

II.     **Greater Risk in Local Jails, Detention Facilities, and Prisons**.

Inmates held at local jails, detention facilities, and prisons are at a much higher risk of contracting COVID-19 because of "crowded dormitories, shared lavatories, limited

medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated or detained persons, and transport of incarcerated or detained person in multi-person vehicles for court-related, medical, or security reasons." CDC, Megan Wallace et al, "COVID-19 in Correctional and Detention Facilities – United States, February-April 2020 ("CDC Detention Report") (May 15, 2020). Once introduced, the virus spreads quickly because of the close confines of the inmates. Moreover, recent data has shown that the risk of contracting the virus is greatly increased by *prolonged time* exposed to the virus.[1]  The longer an inmate is in the presence of the viral particles, the more of those viral particles an inmate ingests—greatly increasing their risk of contracting COVID-19.  *See Supra* Footnote 1.  Medical professionals have long warned about the "tinderbox effect" in local jails, detention centers, and prisons.  *See* Basank v. Decker, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *3 (S.D.N.Y. Mar. 26, 2020).[2]  Many Courts have already recognized the clear and present danger of the spread of COVID-19 in local jails, detention centers, and prisons.  *See* Savino I, 2020 WL

---

[1]     Eric Levenson, Coronavirus Infection Isn't Just About Hygiene and Distance.  It's About Time, Too (May 19, 20202), https://www.cnn.com/2020/05/18/us/coronavirus-time-risk/index.html, (last visited May 19, 2020).

[2]     Jennifer Gonnerman, How Prisons and Jails can Respond to the Coronavirus, The New Yorker (March 14, 2020), https://www.newyorker.com/news/q-and-a/how-prisons-and-jails-can-respond-to-the-coronavirus ("it's going to be very, very difficult to deliver a standard of care either in the detection or the treatment of people who are behind bars. I just have really grave concerns"); *see also* Dr. Lipi Roy, Infections And Incarceration: Why Jails And Prisons Need To Prepare For COVID-19 Now*,* (March 11, 2020), https://www.forbes.com/sites/lipiroy/2020/03/11/infections-and-incarceration-why-jails-and-prisons-need-to-prepare-for-covid-19-stat/#1fa6b08e49f3 ("Hand sanitizers, for instance, are often considered contraband . . . . Other harsh realities of jail life that prevent proper application of CDC recommendations include limited access to toilet paper and paper towels; and handcuffs prohibit the use of hands to cover one's mouth.").

1703844, at *3; <u>Durel B. v. Decker</u>, No. CV 20-3430 (KM), 2020 WL 1922140, at *2 (D.N.J. Apr. 21, 2020) (observing the "stark reality is that avoiding exposure to COVID-19 is impossible for most detainees and inmates.")

There have been at least 42,000 coronavirus infections and 432 deaths in state prisons, federal prisons and local jails.[3]  Many of the infections have been asymptomatic. *See id.*  Over 70 percent of federal inmates tested have COVID-19, "strongly suggesting there are far more COVID-19 cases" than diagnosed.[4]  The country's three largest clusters are in prisons that have more than 1,200 cases each.  *See supra* Footnote 3.  At the nearby South Bay Correctional Facility (South Bay, Florida), at least 42 prison staff have tested positive for the coronavirus.[5]  As of May 19, 2020, approximately 9,294 inmates had been tested for COVID-19 in Florida State prisons, approximately 1119 inmates had tested positive for COVID-19, and approximately 239 staff members had tested positive for COVID-19.[6]  At the Miami-Dade County Jail, 481 inmates have tested

---

[3]    NY Times, Coronavirus in the U.S.: Latest Map and Case Count, https://www/nytimes.com/interactive/2020/us/coronavirus-us-cases.html?action=click&module=Top%20Stories&pgtype=Homepage&action=click&module=Spotlight&pgtype=Homepage#states. (Updated May 19, 2020 8:25 a.m.).

[4]    Michael Balsamo, Over 70% of tested inmates in federal prisons have COVID-19, (April 29, 2020) https://apnews.com/fb43e3ebc447355a4f71e3563dbdca4f ((last visited May 19, 2020).

[5]    Ana Ceballos, COVID-19 stalks vulnerable Florida prey in prison workers (May 5, 2020), https://www.tampabay.com/news/health/2020/05/05/covid-19-stalks-vulnerable-florida-prey-in-prison-workers/ (last visited May 19, 2020).

[6]    COVID-10 Information, http://www.dc.state.fl.us/comm/covid-19.html (last visited May 19, 2020).

positive for COVID-19.[7]  Nearly 41 percent of inmates at the Miami-Dade County Jail

tested have tested positive for COVID-19, which is four times higher than the rate of

positive tests in the general public in Miami-Dade County.  *See id.*  And finally, in the New

York City Jail system, 1,259 correction officers have contracted COVID-19.[8]  Of the 3,900

inmates left in the city's jails, 363 have contracted the virus.  *See id.*

III.     **THE FAILURE TO TEST DEFENDANTS FOR COVID-19 IS A VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT.**

a. **Legal Standard.**

The Due Process Clause of the Fifth Amendment forbids the government from

depriving a person of life, liberty, or property without due process of law.  U.S. Const.

amend. V.  The Due Process Clause applies to "all 'persons' within the United States

including aliens, whether their presence here is lawful, unlawful, temporary, or

permanent." Zadvydas v. Davis, 533 U.S. 678, 693 (2001).  Constitutional protections for

incarcerated defendants include the right to reasonable safety and medical care.  *See*

Estelle v. Gamble, 429 U.S. 97, 103 (1976).  "The rationale for this principle is simple

enough: when the State by the affirmative exercise of its power so restrains an individual's

liberty that it renders him unable to care for himself, and at the same time fails to provide

for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable

---

[7]      Nearly 500 Miami jail inmates, a staggering 41 percent tested, have caught the coronavirus (May 19, 2020), https://www.miamiherald.com/news/local/crime/article242842156.html (last visited May 20, 2020).

[8]      Jan Ransom, Virus Raged at City Jails, Leaving 1,259 Guards Infected and 6 Dead (May 20, 2020), https://www.nytimes.com/2020/05/20/nyregion/rikers-coronavirus-nyc.html (last visited May 20, 2020).

safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 200 (1989).  The State's duty to protect derives from the limitation "imposed on [the detainee's] freedom to act on his own behalf." *Id.*  If the State fails to satisfy its obligations, then the Government must remedy an Eighth Amendment violation. *See* Brown v. Plata, 563 U.S. 493 (2011).  A defendant not yet sentenced (and without a final judgement) would have equal, if not possibly greater rights, under the Fifth Amendment as a convicted defendant under the Eighth Amendment.  *See* Bell v. Wolfish, 441 U.S. 520, 545 (1979).

"To establish a valid Eighth Amendment claim, 'a prisoner must allege acts or omissions sufficiently harmful to evidence [the] deliberate indifference [of prison officials] to [his] serious medical needs.'" Fernandez v. United States, 941 F.2d 1488, 1494 (11th Cir. 1991) (*quoting* Estelle v. Gamble, 429 U.S. 97, 106 (1976)); Kosilek v. Spencer, 774 F.3d 63, 91 (1st Cir. 2014) (*en banc*) ("The subjective element of an Eighth Amendment claim for injunctive relief requires not only that [the plaintiff] show that the treatment she received was constitutionally inadequate, but also that the DOC was—and continues to be—deliberately indifferent to her serious risk of harm.").

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d 1272, 1280 (11th Cir. 2017).  A failure to act or a refusal to act resulting in depravation of "'the minimal civilized measure of life's necessities'" satisfies the objective

component of the test under the Eighth Amendment.  Farmer v. Brennan, 511 U.S. 825, 834 (1994).

To prove deliberate indifference, prisoners must establish "(1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence." Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d at 1280 (*citing* McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." Lancaster v. Monroe Cty., Ala., 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by* LeFrere v. Quezada, 588 F.3d 1317, 1318 (11th Cir. 2009).  Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. *See* Harris v. Coweta Cty., 21 F.3d 388, 393–94 (11th Cir. 1994) (*citing* Brown v. Hughes, 894 F.2d 1533, 1537–39 (11th Cir. 1990)).  Finally, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." Mandel v. Doe, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted).

Most importantly, an inmate is protected against both current and future harm by the Eighth Amendment.  Helling v. McKinney, 509 U.S. 25, 33 (1993).  A prison official may not be "deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms." *Id.* The Constitution provides a remedy regardless of whether the defendant has already been infected and even if all inmates would not be infected. *Id.* (observing "[i]t would be

9

odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."

**b. Quality Standard of Care Requires that All Federal Detainees at the Charlotte County Jail be Tested for COVID-19.**

Charlotte County has acknowledged that one of its staff, who has come in contact with the Defendant (and approximately 71 other federal inmates), has tested positive for COVID-19. All scientific data shows that COVID-19 is frequently passed by carriers who are asymptomatic.[9] As a result, the process of waiting to see if inmates get sick is not an acceptable method of determining if there is a COVID-19 epidemic in the Charlotte County Jail. Since over 9,000 inmates have been tested in Florida prisons (not to mention, additional testing in the Miami-Dade County Jail), it is clear that the State of Florida does have funds for inmate testing and that other facilities have found that testing is appropriate for inmates exposed to COVID-19. *See supra* Footnotes 6-7.

The inmates do not have the ability to go to a drive through testing center. The inmates are reliant on the U.S. Marshal's office and its designee (the Charlotte County Jail) for their care. *See* <u>Estelle v. Gamble</u>, 429 U.S. at 103. Although the Fifth Amendment, through the Due Process Clause, is applicable, the Eighth Amendment provides guidance on how the Court should consider the Defendant's request that the Defendant be tested for COVID-19. First, is there a serious medical need? The answer is clearly yes. One of the jail staff who interacted with the defendant (and approximately 71 other Federal inmates) tested positive for COVID-19. The defendant should be tested

---

[9]    CDC, Recommendations Regarding the Use of Cloth Face Coverings, Especially in Area of Significant Community-Based Transmission, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html#studies (last visited May 19, 2020).

to confirm that he is negative for COVID-19 for his own health care and to make sure that

he is not passing it to the other inmates.  The need for testing is obvious since any lay

person under the same circumstances would immediately seek out testing for his or her

own health and for others.  *See* Dang ex rel. Dang v. Sheriff, Seminole Cty., 871 F.3d at

1280.[10]  Over 90,000 people have died in approximately 75 days.  *See Wordometers.info*

(World/Countries/United States), (Last updated: May 19, 2020, 13:00 GMT, Last Visited

May 19, 2020). The danger is clear and present.

The next question is whether the U.S. Marshal's and its designee, the Charlotte

County Jail, are acting with deliberate indifference.  *See* Dang ex rel. Dang v. Sheriff,

Seminole Cty., 871 F.3d at 1280*.*  First, the U.S. Marshal and the Charlotte County Jail

clearly know of the serious harm caused by COVID-19.[11]  The death toll and the lockdown

of   the   United   States   made   this   risk   clear   to   all.    *See   Wordometers.info*

(World/Countries/United States), (Last updated: May 19, 2020, 13:00 GMT, Last Visited

May 19, 2020). Second, the U.S. Marshal and the Charlotte County Jail have acted in

disregard of that risk by conduct that is more than mere negligence.  *See* Dang ex rel.

Dang v. Sheriff, Seminole Cty., 871 F.3d at 1280*.*  Despite knowing the risk of death from

---

[10]     It should be noted that the need for testing goes beyond just the inmates. Asymptomatic carriers are a danger to defense counsel, the U.S. Marshal's staff, United States Probation, and anyone who works in the Courthouse.  As soon as defendants begin to be reintroduced into the U.S. Courthouse in Fort Myers, all staff working at the Courthouse will be at risk unless there is testing of the defendants to ensure that there are no asymptomatic defendants secretly carrying the virus.

[11]     The Charlotte County Jail has published a blog to update the public on its actions taken. *See* COVID-19 Update, https://ccsoblog.org/2020/05/12/covid-19-agency-update/ (last visited on May 19, 2020).

COVID-19, despite likely being aware of the rapid spread in prisons, despite likely knowing that the Florida State Prisons are testing for COVID-19, the U.S. Marshal and the Charlotte County Jail are refusing to test their Federal inmates who have been exposed to a deadly communicable disease. *See* Helling*,* 509 U.S. at 33. In this case, the U.S. Marshall and the Charlotte County Jail are aware that the inmates are at serious risk of infection and possibly death, yet neither has had any of the Federal inmates tested. Lancaster, 116 F.3d at 1425. The U.S. Marshal's and the Charlotte County Jail's inaction is nothing short of negligence. *See id.* Lack of funds is not an appropriate excuse for failing to take care of the defendants. *See* Estelle*,* 429 U.S. at 103.

The obvious solution for this ongoing negligence by the Charlotte County Jail is to test the Defendant. President Trump promised on March 6, 2020 that "anyone who wants a test can get a test."[12] The Defendant wants a test. The Court should order the Defendant be tested immediately.[13]

## **CONCLUSION**

For the forgoing reasons, Mr. Baryla respectfully request that the Court order the U.S. Marshall and its designee—the Charlotte County Jail—to immediately test the Defendant for COVID-19. *See* Estelle, 429 U.S. at 103.

---

[12]   Noah Weiland, Anyone Who Wants a Coronavirus Test Can Have One, Trumps Says.   Not   Quite,   Says   His   Administration   (March   7,   2020), https://www.nytimes.com/2020 /03/07/us/politics/trump-coronavirus-messaging.html (last visited May 19, 2020).

[13]   If the Court finds that it does not have the power to order the Defendant tested for COVID-19 (which the Defendants would disagree with based on Estelle, 429 U.S. at 103.), then the Defendant anticipates filing a motion for pre-trial release.

Respectfully submitted,

James T. Skuthan
Acting Federal Defender

/s/ Russell K. Rosenthal
Russell K. Rosenthal
Florida Bar No. 0319244
Assistant Federal Defender
2075 West First Street, Suite 30
Fort Myers, Florida 33901
Telephone: 239-334-0397
Facsimile: 239-334-4109
E-Mail: ellis_summers@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of May 2020 the foregoing was electronically filed with the Clerk of Court and a copy will be sent electronically to Yolande Viacava, Assistant United States Attorney, 2110 First Street, Fort Myers, FL 33901.

/s/ Russell K. Rosenthal.
Russell K. Rosenthal
Assistant Federal Defender

13